### BEANE et al. v. FIRST NAT. BANK & TRUST CO. OF ASHEVILLE, N. C., et al.

#### No. 4171.

Circuit Court of Appeals, Fourth Circuit.

Oct. 18, 1937.

Kingsland Van Winkle, of Asheville, N. C. (Harkins, Van Winkle & Walton, of Asheville, N. C., on the brief), for appellants.

Junius G. Adams, of Asheville, N. C. (Adams & Adams, of Asheville, N. C., on the brief), for appellees.

Before NORTHCOTT and SOPER, Circuit Judges, and CHESNUT, District Judge.

SOPER, Circuit Judge.

This suit in equity was brought by a copartnership, trading as stockbrokers in New York under the firm name of Fenner & Beane, to establish a priority over the general creditors of the First National Bank & Trust Company of Asheville, N. C., with respect to a claim of $16,021.16, notwithstanding the fact that the bank had become insolvent and its affairs had been placed partly in the hands of a successor bank of substantially similar name and partly in the hands of liquidating trustees. The firm had a branch office in Asheville and on March 1, 1933, had a credit balance of $7,000 in the Asheville bank. After banking hours on that day the Asheville manager of the firm, in accordance with instructions received from the main office in New York, directed the bank to transmit this balance to the firm in New York, but the bank failed to do so. On March 3 the direction was renewed and after banking hours on that day the bank wired the branch of the Federal Reserve Bank at Charlotte, N. C., to remit $7,000 from the funds on deposit to the credit of the bank to the firm in New York. Banking conditions were then such on the eve of the bank holiday, declared by the President on March 6, 1933, that it was impossible for the Federal Reserve Bank to comply and the funds were not forwarded to New York.

The bank closed its doors for the usual transaction of banking business at the end of banking hours on March 2, and, when it opened on March 3, it was on a restricted basis and each depositor was permitted to withdraw only 5 per cent. of the funds to his credit. The bank has never resumed payment of deposits in the customary manner; but a reorganization took place and a new institution became its successor. The new bank took over all the acceptable assets of the old and assumed 50 per cent. of its unsecured indebtedness, while the unacceptable assets of the old were delivered to trustees to liquidate and to apply the proceeds pro rata to the payment of the balance of the old bank's debts. The new

bank and the trustees were joined as defendants in the suit.

The District Judge correctly held that the plaintiffs had no valid claim to priority as to the deposit of $7,000 above described. The bank was on a restricted basis on March 3 when it undertook to remit the money to New York. It was in fact insolvent and could not lawfully prefer one of its creditors over the other. 12 U.S.C.A. § 91. The relationship between the bank and the depositor was that of debtor and creditor, and it remained such when it unsuccessfully attempted to remit the funds to New York in compliance with the depositor's request. No trust was created thereby. Blakey v. Brinson, 286 U.S. 254, 52 S.Ct. 516, 76 L.Ed. 1089, 82 A.L.R. 1288. But even if it be supposed that the acts of the parties resulted in the creation of a trust, the funds coming into the hands of the successor bank and the liquidating trustees were not augmented thereby and consequently the claimant did not become entitled to priority. Harmer v. Rendleman (C.C.A.) 64 F.(2d) 422.

The plaintiffs, however, rely more confidently upon an item of $9,021.96, consisting of two checks, one on Concord and one on Canton, N.C., which the plaintiffs deposited with the bank for collection on February 28, 1933. The agreement between the parties as to checks of out-of-town customers of the plaintiffs deposited with the bank for collection was that the checks should be entered in their passbook, but the proceeds thereof would not be available to them until the same had actually been collected and the plaintiffs notified that the collection had been made. It was also agreed that on the receipt of an out-of-town check for collection, the bank would either notify the plaintiffs, when the check had been collected, or else would indicate upon the duplicate deposit slips the estimated number of days it would take for the check to clear and be collected, at the end of which the plaintiffs would be free to draw on the deposit unless informed by the bank that the check had not been collected within the indicated time. No notation was made on the deposit slips with respect to the collection items in question.

The checks were sent by the Asheville bank to the Federal Reserve Bank at Charlotte for collection, and by the latter to other banks in Concord and Canton. The Federal Reserve Bank received the

proceeds and credited them to the account of the Asheville bank on March 2, 1933,• but that bank was not advised of the collection until after banking hours on that day. At that time it was insolvent to the knowledge of its officers and thereafter never resumed its normal functions. It was put upon a restricted basis as above described by a resolution of the board of directors passed at a meeting held before banking hours on March 3, 1933. The plaintiffs were not notified that the collection had been made until several days thereafter. Thus the proceeds of the checks, although in the hands of the Federal Reserve Bank at Charlotte, were not actually made available to the Asheville bank nor to the plaintiffs until after the bank had ceased to do business. After the reorganization of the Asheville bank, the proceeds of the checks were turned over by the Federal Reserve Bank to the successor bank and became part of its assets.

The relationship between the depositor and the bank with reference to the item of $9,021.96, when it was deposited for collection, was that of principal and agent. "When a bank receives for deposit a check endorsed without restriction and gives credit for it to its depositor as cash in a drawing account so that the depositor may draw against the credit at once, and there are no contrary agreements or understandings, title passes to the bank and the check becomes its absolute property and the relationship of debtor and creditor is created"; but "when a check is given to a bank for collection and deposit and the bank receives it—only for collection—the property in the check remains in the depositor and the relationship of debtor and creditor does not exist;" and "upon the deposit by a customer, in a bank, of a check for deposit to his account under an agreement with the bank that the bank will not allow credit for the check until the check is paid in money nor permit the customer to draw against the deposit thus created, the relationship that exists between the bank and the customer is not that of debtor and creditor but of principal and agent—and in these circumstances the entry of the item to the credit of the depositor on the books of the bank does not affect or change this relationship." Groner, J., in Hardee v. George H. Price Co., 67 App.D.C. 25, 89 F.(2d) 497, 499.

In the pending case, the checks were given to the bank for collection and de-posit, and, although the items were credited upon the depositors' passbook, the transaction was made subject to the agreement that the proceeds of checks would not be available to the depositors until collection had actually been made and they had been notified thereof. Consequently the relationship between the parties of principal and agent was established. The disputed question arises as to whether the relationship continued until the closing of the bank so as to entitle the depositors to receive the proceeds of the checks in full or whether, on the other hand, the relationship of principal and agent had ceased at that time and had been succeeded by that of debtor and creditor. The general rule applicable to such a situation is thus stated in Jennings v. United States F. & G. Co., 294 U.S. 216, 219, 55 S.Ct. 394, 395, 79 L. Ed. 869, 99 A.L.R. 1248: "In the absence of tokens of a contrary intention, the better doctrine is, where the common law prevails, that the agency of the collecting bank is brought to an end by the collection of the paper, the bank from then on being in the position of a debtor, with liberty, like debtors generally, to use the proceeds as its own."

The decision of the question depends in whether or not the collection of the checks by the Federal Reserve Bank of Charlotte and the crediting of the proceeds thereof to the Asheville bank constituted a completion of the collection so as to transform the relationship of principal and agent between the bank and the depositor to that of debtor and creditor; and this question must be decided in contemplation of the agreement between the bank and the depositor above described. In Commercial Bank v. Armstrong, 148 U.S. 50, 13 S.Ct. 533, 37 L.Ed. 363, cited with approval in Jennings v. United States F. & G. Co., supra, the Supreme Court considered a situation in which the Fidelity Bank received collection items from a forwarding bank with the understanding that it would collect the items and make remittance on stated days in each month. It became necessary for the Fidelity to send the items to other banks as subagents for collection. At a time when the proceeds of certain collections were in the hands of the subagents, the Fidelity failed and a receiver was appointed, and subsequently the proceeds were paid by the subagents to him. Suit to recover the funds was then brought against the receiver by the forwarding bank. It was held that the

mere fact that the subagents of the Fidelity had collected the money due on the items and held it for delivery to the Fidelity did not amount to a receipt of the money by that bank or a mingling of the proceeds with its general funds, unless the collections made by the subagents had been credited upon indebtedness due by the Fidelity to them. The court said (148 U.S. 50, at page 57, 13 S.Ct. 533, 534, 37 L.Ed. 363): "If, before the subagent parts with the money, or credits it upon an indebtedness of the agent bank to it, the insolvency of the latter is disclosed, it ought not to place the funds which it has collected, and which it knows belong to a third party, in the hands of that insolvent agent or its assignee; and, on the other hand, such insolvent agent has no equity in claiming that this money, which it has not yet received, and which belongs to its principal, should be transferred to, and mixed with, its general funds in the hands of its assignee for the benefit of its general creditors, and to the exclusion of the principal for whom it was collected. Whether it be said that such funds are specifically traceable in the possession of the subagent, or that the agent has never reduced those funds to possession, or put itself in a position where it could rightfully claim that it has changed the relation of agent to that of debtor, the result is the same. The Fidelity received this paper as agent. At the time of its insolvency, when its right to continue in business ceased, it had not fully performed its duties as agent and collector. It had not received the moneys collected by its subagent. They were traceable as separate and specific funds, and therefore the plaintiff was entitled to have them paid out of the assets in the hands of the receiver, for, when he collected them from these subagents, he was, in fact, collecting them as the agent of the principal. No mere bookkeeping between the Fidelity and its subagents could change the actual status of the parties or destroy rights which arise out of the real facts of the transaction."

It is clear from this decision that the mere collection of an item by a subagent bank does not necessarily constitute the completion of the collection by the agent bank so as to create the relationship of debtor and creditor between it and the owner of the item. It is suggested, however, that in the pending case the proceeds of the collection had not only been received

but had been credited by the Federal Reserve Bank at Charlotte to the account of the Asheville bank on March 2 before the public announcement of the virtual closing of that bank had been made, and that therefore there had been a mingling of the proceeds of the collection with the general funds of the bank and the assumption by it of the role of debtor in accordance with banking custom before the failure took place. On the surface this may seem to be so, but in reality there had been no mingling of funds because they had not become available to the failed bank. It will be recalled that it received no notice of the collection on March 2 until after banking hours on that day, and that by that time its insolvency had become so well known to its managing officers that the directors met before banking hours on March 3 and resolved to suspend the active operations of the bank.

In Washington Loan & Banking Co. v. Fourth National Bank of Macon (C.C.A.) 38 F.(2d) 772, it was held under similar circumstances that the agency of a bank, intrusted with an item for collection and credit, ceases and the relationship of general debtor to the depositor begins only when, the collection having been made by a subagent, the proceeds become available to the agent bank and it in turn makes them available to the owner of the item; the mere collection of the funds and entry of them by the subagent to the credit of the agent being insufficient to terminate the latter's agency. In this connection see, also, Bay State Milling Co. v. Hartford Acc. & Ind. Co., 193 Minn. 517, 259 N.W. 4, 99 A.L.R. 507; Jefferson County Bldg. & Loan Ass'n v. Southern Bank & Trust Co., 225 Ala. 25, 142 So. 66; Guignon v. First Nat. Bank, 22 Mont. 140, 55 P. 1051, 1097; Burdick v. Schmitt, 56 Nev. 229, 48 P.(2d) 762; compare In re Canal Bank & Trust Co., (La.App.) 167 So. 485, decree recalled (La.App.) 170 So. 420.

It is noteworthy as an equitable circumstance in the pending case that not only had the funds not been made available to the Asheville bank before the failure, but they had not been made available to Fenner & Beane, the depositors, because they had not received the notice of collection which under the agreement between the parties was a prerequisite to the use by them of the funds. This point is not essential to the determination of the case and we do not base our decision upon it,

for the contract may possibly be interpreted in the light of the surrounding facts to mean that the bank was permitted to enter into enjoyment of the funds immediately upon receiving them and before the transmission of notice to the depositors. It is sufficient to point out that the entry of the credit on the books of the Federal Reserve Bank to the account of the Asheville bank did not actually afford the latter an opportunity to mingle or use the funds, because it had no knowledge that the collection had taken place until it was too late to exercise ownership over them. The cashier of the Asheville bank testified that the bank did not undertake to draw against a collection item until notified of its collection.

There is no difficulty as to this item with regard to tracing the funds or the augmentation of the assets coming into the hands of the successor bank. Our conclusion is that the decree of the District Court should be affirmed as to the item of $7,000, but reversed as to the item of $9,021.96. The case is therefore remanded to the District Court for further proceedings in accordance with this opinion.

Remanded.